UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CIVIL ACTION NO. 3:15-CV-129-TBR

JONATHAN E. HANDMAKER, *et al.*                                    PLAINTIFFS

v.

CERTUSBANK, N.A.                                                   DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Plaintiffs' motion for prejudgment attachment.

(DN 94).  Defendant has responded.  (DN 95).  Plaintiffs have replied.  (DN 97).  Both parties

have filed a brief (DN 102, 103) and response.  (DN 104, 105).  A hearing was held in

Louisville, Kentucky on May 17, 2016.  (DN 99).  The court reporter was Dena Legg.  Ben

Lowry and Kenneth Handmaker appeared on behalf of the Plaintiffs.  Wendy Miller and Charles

McDonald appeared on behalf of the Defendant.  For the following reasons, Plaintiff's motion

for prejudgment attachment is DENIED.

BACKGROUND

This action arises out of Plaintiff Jonathan Handmaker and Plaintiff George Vredeveld

Jr.'s employment with Defendant CertusBank, N.A. ("Certus").  Handmaker and Vredeveld

formed a bank, Quadrant Financial, Inc. which specialized in small business loans.  (Docket

#25).  In 2004, Handmaker and Vredeveld sold an interest in Quadrant Financial to First

Chatham Bank.  In 2012, Handmaker, Vredeveld, and First Chatham Bank sold Quadrant

Financial to Certus.  More detail about that transaction may be found in this Court's prior

opinions.  (DN 81, 84).  With one exception, the parties have settled all disputes arising from that

transaction.  (DN 88).  The sole remaining claim belongs to Handmaker and Vredeveld, who

1

went to work for Certus after selling Quadrant Financial to Certus.  Handmaker and Vredeveld claim that Certus failed to pay them a bonus for 2014.

The parties negotiated the sale of Quadrant Financial to Certus in October, 2012.  During those negotiations, Certus was also negotiating with Handmaker and Vredeveld to hire them as Executive Vice Presidents, Co-Head of Government Guaranteed Lending.  An initial draft of their employment agreement shows that Handmaker and Vredeveld would each be paid a base salary of $325,000 for 2013 and a base salary of $275,000 for 2014.  (DN 104-1).  In addition, the draft agreement made Handmaker and Vredeveld "eligible to participate in an annual incentive program" and created "Performance Goals" which would determine the size of Handmaker and Vredeveld's bonuses.  (DN 104-1).  For the first year, Handmaker and Vredeveld could earn a bonus up to 75% of their base salary.  (DN 104-2, p. 5).  Handmaker claims that their base salary was reduced by $50,000 for 2014 because Certus's president, Angela Webb, "wanted to shift our compensation towards more variable. . . . with the understanding that we would be able to make up that $50,000 readily through variable comp, plus even more, provided that we performed."  (DN 104-2, p. 6).

The employment agreement Handmaker and Vredeveld eventually signed contained the same base salaries, but a significantly different bonus clause.  (DN 1-2, 1-3).  Handmaker claims that during negotiations, "[w]e did not feel comfortable at that time committing to a formula" because there were many aspects of the formula that Handmaker and Vredeveld did not fully understand or lacked sufficient information to judge.  (DN 109-1, p. 65).  Accordingly, the executed employment agreement did not contain any reference to a bonus formula.  Instead, it broadly stated that Handmaker and Vredeveld would "be eligible to participate in Certus' annual incentive program on terms and conditions that are mutually agreeable to you and the Certus

senior executive team." (DN 1-2). The executed employment agreement also stated that the parties "agree to use reasonable best efforts to establish the performance criteria for the first performance period . . . as soon as reasonably practicable following the date hereof, and in any event prior to the Effective Date." (DN 1-2).

The parties signed the employment agreement on October 31, 2012. (DN 1-2). They did not, however, negotiate performance criteria for Handmaker and Vredeveld's bonus for 2013. Instead, Handmaker and Vredeveld simply worked through 2013. During this time, Handmaker claims that Certus's management "continued to commend us for our strong performance, our leadership, the results, and all the things we were doing for the bank. We trusted them. And they continued to assure us that they would take care of us if we continued to perform." (DN 109-1, p. 43). On January 10, 2014, Handmaker asked Webb, Certus's president, via email: "while we are on the topic of an incentive plan (or lack thereof) for me and George, I am curious how our 2013 incentive comp will be handled due to the absence of an agreed upon plan?" (DN 104-4). Handmaker and Webb subsequently had a phone call in which Webb confirmed that Handmaker and Vredeveld would receive a bonus, but Handmaker does not recall Webb stating an amount or explaining how the bonus would be calculated. (DN 109-1, p. 40). On January 17, Webb requested "final year performance metrics" from Handmaker. (DN 104-4). Handmaker and Vredeveld were subsequently told they had been awarded a bonus of $145,000 for 2013, a figure which was confirmed by letter dated February 18, 2014. (DN 109-7).

After Handmaker and Vredeveld received their 2013 bonuses, the issue of bonuses went largely undiscussed for six months. Handmaker does not recall any specific discussions, but claims he and Vredeveld received "continuous accolades from Walter and Angela about our performance and how well we were doing and the leadership that we were showing within the

bank, and assuring us that they would take care of us if we continued to perform strongly." (DN 109-1, p. 46). On July 18, 2014, the topic was revisited when Colletta Bryce, the Chief Human Resources Officer for Certus, sent Handmaker an email. Bryce inquired whether Handmaker and Vredeveld's $145,000 bonus for 2013 was "a guaranteed payment or a formulaic one based on performance." (DN 16-3). In response, Handmaker explained the formula found the draft employment agreement, though he admitted it "never materialized into a set formula." (DN 16-3). Over the next several months, Handmaker had sporadic conversations with Bryce and Certus's CEO John Poelker. (DN 16-3, 16-4). In October, 2014, Handmaker sent Poelker a detailed email explaining the negotiation of the employment agreements, the formula contained in the draft employment agreement, and expressing his expectation that Handmaker and Vredeveld would receive a bonus "commensurate with our performance." (DN 109-10). In December, 2014, Bryce clarified to Handmaker that "your payment is driven by business results rather than 'pay to stay.'" (DN 16-3). Bryce also informed Handmaker and Vredeveld that their bonus "should be made in the February timeline," although the "amount has not yet been determined." (DN 16-3).

Handmaker and Vredeveld were terminated on January 21, 2015. The termination notice did not state a reason. It did say that Handmaker and Vredeveld "will not be paid any bonus for 2014 since the bank lost money during the year and no officers are receiving any bonus." (DN 1-4). Handmaker and Vredeveld claim it was a breach of their employment agreement for Certus to fail to pay them a bonus for 2014.

In 2014, Certus was placed in "troubled condition" by the Office of the Comptroller of the Currency. (DN 102). Certus surrendered its national banking charter in November, 2015 and transferred its residual assets and liabilities to CBSUB, Inc. (DN 102).

Before the Court is Handmaker and Vredeveld's motion for prejudgment attachment.

## STANDARD

Fed. R. Civ. P. 64(a) provides:  "At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment."

Pursuant to KRS § 425.307, "the plaintiff may apply pursuant to this chapter for an order of attachment by filing a written motion."  Plaintiff's motion should set out "(a) [t]he nature of the plaintiff's claim; (b) [t]hat it is just; (c) [t]he sum which the plaintiff believes he ought to recover; and (d) [t]he existence of any of the grounds for an attachment set forth in KRS 425.301 or 425.306."  KRS § 425.307(2);  *see also PNC Bank, Nat. Ass'n v. Pers.*, 2006 WL 3087145, at *3 (W.D. Ky. Oct. 27, 2006) ("Before any order for pre-judgment attachment will be entered by this court, the plaintiff must: (1) establish that it is entitled to such an order pursuant to K.R.S. § 425.301; (2) demonstrate the probable validity of its claim against the defendants; and (3) execute a bond as required by K.R.S. § 425.309").

Plaintiffs claim prejudgment attachment is proper in this case pursuant to KRS § 425.301(2), which provides that a plaintiff may seek prejudgment attachment "[i]n an action for the recovery of money due upon a contract, judgment or award, if the defendant have no property in this state subject to execution, or not enough thereof to satisfy the plaintiff's demand, and the collection of the demand will be endangered by delay in obtaining judgment or a return of no property found."

## DISCUSSION

Handmaker and Vredeveld have moved for prejudgment attachment.  The Supreme Court requires that, before an order for prejudgment attachment is entered, the plaintiffs must prove

"the validity, or at least the probable validity, of the underlying claim against the alleged debtor." *Fuentes v. Shevin*, 407 U.S. 67, 96-97 (1972).  The parties strongly dispute the definition of "probable validity."  Accordingly, the Court will (I) define the "probable validity" standard, and then (II) apply that standard to Handmaker and Vredeveld's claim.

## I.    Probable Validity Defined.

The parties agree that Handmaker and Vredeveld must demonstrate the "probable validity" of their claims in order for this Court to award prejudgment attachment.   However, the parties dispute what "probable validity" means.  The Court holds that "probable validity" requires a showing that the party seeking prejudgment attachment is more likely than not to prevail on their claim.

The phrase "probable validity" comes from the Supreme Court's decision in *Fuentes v. Shevin*, 407 U.S. 67 (1972).  In *Fuentes*, the Supreme Court was asked to decide the constitutionality of Florida and Pennsylvania's laws authorizing the summary seizure of goods under a writ of replevin.  Both states permitted writs to be issued "simply upon the ex parte application of any other person who claims a right to them and posts a security bond," with no notice to the possessor and no opportunity to challenge the seizure.  *Id*. at 70.  The *Fuentes* court held these laws denied due process of law, which requires a "fair prior hearing" before creditors could seize property.  *Id*. at 96.  The Supreme Court left it to states to formulate the "nature and form of such prior hearings," but stated that because the "essential reason for the requirement of a prior hearing is to prevent unfair and mistaken deprivations of property," it is "axiomatic that the hearing must provide a real test."  *Id*. at 97.  The *Fuentes* court then cited Justice Harlan's concurrence in *Sniadach* for the proposition that "[d]ue process is afforded only by the kinds of 'notice' and 'hearing' that are aimed at establishing the validity, or at least the probable validity,

6

of the underlying claim against the alleged debtor before he can be deprived of his property." *Id.* at 97 (quoting *Sniadach v. Family Fin. Corp. of Bay View*, 395 U.S. 337, 342 (1969) (Harlan, J. concurring).

The *Fuentes* court did not define "probable validity."  However, Kentucky law defines it as following:  "[t]he term 'probable validity of the claim' means a claim in which it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." KRS § 425.006(2).  This adoption of the "more likely than not" standard, otherwise known as preponderance of the evidence,[1] is in line with other states.  *See e.g.* Cal. Civ. Proc. Code § 481.190 (West) ("A claim has 'probable validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim"); *Cohen v. Sandcastle Homes, Inc.*, 469 S.W.3d 173, 183 (Tex. Ct. App. 2015).

Handmaker and Vredeveld argue "probable validity" is akin to probable cause, a phrase common in criminal law.  Probable cause requires a lesser showing than a preponderance of the evidence.  *See United States v. Rodgers*, 536 F. App'x 621, 624 (6th Cir. 2013).  "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'"  *United States v. Padro*, 52 F.3d 120, 122-23 (6th Cir. 1995) (quoting *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir. 1990)).  Handmaker and

---

[1] A preponderance of the evidence means "such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in your minds belief that what is sought to be proved is more likely true than not true."  *Williams v. Eau Claire Pub. Sch.*, 397 F.3d 441, 446 (6th Cir. 2005).

Vredeveld cite one case which has adopted the "probable cause" standard while rejecting a higher standard. *United States v. Teeven*, 862 F. Supp. 1200, 1217 n. 22 (D. Del. 1992).[2]

The Court does not find the *Teeven* case to be persuasive. The *Teeven* case arose under federal law which has not specifically defined "probable validity." *Id*. Conversely, Handmaker and Vredeveld seek relief pursuant to Kentucky law which has expressly adopted a "more likely than not" standard. KRS § 425.006(2). Moreover, the Court finds the "more likely than not" standard to be more practicable. A "probable cause" standard would favor the creditor, allowing him to encumber the assets of the current possessor of property while making a lesser showing than the possessor. Comparatively, a "more likely than not" standard favors neither party. Accordingly, the Court finds that Handmaker and Vredeveld must establish that they are more likely than not to prevail on their claim.

## II.     The Probable Validity of Handmaker and Vredeveld's Claim.

Handmaker and Vredeveld claim Certus breached their employment agreements by failing to pay them a bonus for 2014. In response, Certus argues that any bonus paid to Handmaker and Vredeveld would be at the discretion of Certus. Both sides are able marshal evidence in support of their argument and the Court believes a jury could find either party's narrative plausible. However, for the following reasons, the Court finds that Handmaker and Vredeveld have not shown that they are more likely than not to prevail on their breach of contract claim.

---

[2] Handmaker and Vredeveld also cite to *Krimstock*, a Second Circuit case, but that case stopped short of saying probable cause and probable validity were the same standard. *Krimstock v. Kelly*, 306 F.3d 40, 49 (2d Cir. 2002) ("Although there is an obvious overlap between probable cause for a seizure and the probable validity of a retention, the two are not necessarily coextensive").

As this is a breach of contract claim, the Court begins with the employment agreement. With regards to bonuses, the employment agreement states:

> **Annual Incentive Program**: For each year that you are employed by Certus during the Term you will be eligible to participate in Certus' annual incentive program on terms and conditions that are mutually agreeable to you and the Certus senior executive team. The parties to this letter agreement agree to use reasonable best efforts to establish the performance criteria for the first performance period (which begins on the Effective Date and ends on the first anniversary of the Effective Date) as soon as reasonably practicable following the date hereof, and in any event prior to the Effective Date. The actual annual incentive payment, if any, will be paid to you no later than the 30th day following the end of the applicable performance period, subject to your continued employment through the last day of the applicable performance period. (DN 1-2).

There opening and closing clauses merit special note.[3]  First, the opening sentence establishes Handmaker and Vredeveld's right to "participate in Certus' annual incentive program," but only on "terms and conditions that are mutually agreeable to you and the Certus senior executive team."  (DN 1-2).  The final sentence provides that the "actual annual incentive payment, *if any*, will be paid to you no later than. . . ."  (emphasis added) (DN 1-2).    Thus, while the employment agreement creates an expectancy that Handmaker and Vredeveld may receive a bonus, it requires the agreement of Certus (as well as Handmaker and Vredeveld), and it contemplates the possibility that no bonus will be awarded.

The Court next looks at the parties' own actions in carrying out the contract.  *L.K. Comstock & Co. v. Becon Const. Co.*, 932 F. Supp. 948, 966 (E.D. Ky. 1994), ("[W]here an agreement involves repeated occasions for performance by either party with knowledge of the

---

[3] Comparatively, the Court places little weight on the second sentence, which states both parties would "use reasonable best efforts to establish the performance criteria for the first performance period."  (DN 1-2).  There is no requirement that the performance criteria for the first year, 2013, would have any application to the year now in dispute, 2014.  Moreover, it appears both parties ignored their obligation to create a formula for determining a bonus for 2013 until the year was nearly over.

nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement" (quoting Restatement (Second) of Contracts 202(4) (1979)) *aff'd sub nom. L.K. Comstock & Co. v. Becon Const. Co.*, 73 F.3d 362 (6th Cir. 1995).  In doing so, the Court finds these actions favor Certus's argument that bonuses were left to the discretion of Certus.  The issue of bonuses went largely unaddressed and certainly undecided during 2013. On January 10, 2014, Handmaker inquired "I am curious how our 2013 incentive comp will be handled due to the absence of an agreed upon plan?"  (DN 104-4).  Handmaker and Webb subsequently discussed bonuses via phone.  Further testimony regarding this call will be beneficial, but at this time it appears to favor Certus's interpretation.  Although Webb promised Handmaker and Vredeveld a bonus, Webb did not say what amount the bonus would be or explain how it would be calculated.  (DN 109-1, p. 40).  After this call, Handmaker and Vredeveld appear to have had no further input into their bonuses.  When informed about the amount of their bonus, they simply accepted it.  While it may be that Handmaker and Vredeveld were simply satisfied with the size of their bonus, their limited involvement in calculating their bonus and the fact that Certus appears to have had final say in the size of that bonus suggests that Certus retained ultimate authority over bonuses.

The discussion regarding Handmaker and Vredeveld's 2014 bonus appears to have been initiated by Bryce's inquiry into their 2013 bonus in an email sent on July, 2014.[4]  Handmaker responded that the "bonus amount we received for 2013 was not based on any formula we knew about."  (DN 16-3).   He then explained the formula from the draft employment agreement and

---

[4] Bryce does not recall discussions regarding 2014 bonuses until mid-summer of that year.  (DN 104-8).  Handmaker does not recall specific discussions on this topic, other than "continuous accolades" on how he and Vredeveld were performing.  (DN 109-1, p. 46).

his expectation that the bonus for 2014 "will be commensurate with our performance while making up for the salary cut," a reference to the fact that Handmaker and Vredeveld took a $50,000 base salary reduction for 2014.  (DN 16-3).  Bryce and Handmaker appeared to have discussed bonuses on August 18, though to no apparent resolution.  (DN 16-3).  In October, Handmaker reiterated his same points in an email to Poelker.  (DN 109-10).  In December, 2014, Poelker and Bryce both sent emails stating a bonus was being considered, but the actual amount was still undetermined.  (DN 16-3, 16-4).  However, Handmaker and Vredeveld were terminated in January, 2015, without receiving any bonus.

At this point in the litigation, the Court finds Certus's position more persuasive because the employment agreement merely permits Handmaker and Vredeveld to be eligible for a bonus, provides that any bonus will be paid on terms agreeable to Certus (though as well to Handmaker and Vredeveld), and contemplates that no bonus might be paid.  Furthermore, Certus's dominant role in calculating the bonus, compared to Handmaker and Vredeveld's limited participation and simple acceptance of their 2013 bonus, supports Certus's contention that Certus retained discretion over the size of bonuses.  Certus's claim that the bank lost money and no officers were awarded a bonus for 2014 bolsters their argument that Certus was acting in its discretion to not award Handmaker and Vredeveld a bonus.

Handmaker and Vredeveld have pointed to several facts in their favor.  Handmaker and Vredeveld claim Certus's management continuously reassured them that they were performing well and would receive a bonus.  They also claim that their division was the only profitable division at Certus.  (DN 109-1, p. 49).  Furthermore, Certus did develop an excel spreadsheet which contained a formula for determining their 2013 bonus of $145,000 and was allegedly being used to calculate a bonus for 2014.  (DN 104).  However, Handmaker and Vredeveld were

11

unaware this spreadsheet existed, which reinforces the inference that they had limited input into calculating their bonus.  While possibly a jury could conclude Handmaker and Vredeveld were entitled to a bonus, the Court finds that based on what is before the Court at this time, the evidence weighs in favor of Certus.  Accordingly, the Court must deny Handmaker and Vredeveld's motion for prejudgment attachment.

CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiffs' motion for prejudgment attachment (DN 94) is DENIED.

cc: counsel of record
L 1.40
**C**