UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CIVIL ACTION NO. 3:15-CV-129-TBR

JONATHAN E. HANDMAKER, *et al.*                                    PLAINTIFFS

v.

CERTUSBANK, N.A.                                                    DEFENDANT

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on two pending motions. First, Defendant CertusBank ("Certus") has filed a Motion for Summary Judgment. (DN 118). Plaintiffs have responded. (DN 126). Defendant has replied.  (DN 128). Second, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint. (DN 124).  Defendant has responded. (DN 127). Plaintiffs have replied. (DN 130). These matters are now ripe for adjudication. For the following reasons, the Court will DENY Plaintiffs' Motion for Leave to File a Second Amended Complaint and DENY Defendant's Motion for Summary Judgment.

### BACKGROUND

This action arises out of Plaintiff Jonathan Handmaker and Plaintiff George Vredeveld Jr.'s (collectively, "Plaintiffs") employment with Defendant CertusBank, N.A. ("Certus"). In 2004, Handmaker and Vredeveld sold an interest in Quadrant Financial to First Chatham Bank. In 2012, Handmaker, Vredeveld, and First Chatham Bank sold Quadrant Financial to Certus. More detail about that transaction may be found in this Court's prior opinions. (DN 81, 84). With one exception, which forms the basis of the motions currently before the Court, the parties have settled all disputes arising from that transaction. (DN 88). The sole remaining claim belongs to Handmaker and Vredeveld, who went to work for Certus after selling Quadrant Financial to

Certus. Handmaker and Vredeveld assert a breach of contract claim against Certus, alleging that Certus failed to pay them a bonus to which they were entitled for their performance throughout 2014. (DN 23-2, p. 5).

The parties negotiated the sale of Quadrant Financial to Certus in October 2012. During those negotiations, Certus was also negotiating with Handmaker and Vredeveld to hire them as Executive Vice Presidents, Co-Head of Government Guaranteed Lending. Before ultimately entering into the final Employment Agreements, the parties went through multiple draft agreements, most of which contained specific methodologies for calculating bonuses for Handmaker and Vredeveld under Certus' "Annual Incentive Program." (DN 109-1, pp. 38–39; DN 104-1). Initial drafts of the employment agreements show that Handmaker and Vredeveld would each be paid a base salary of $324,000 for 2013 and a base salary of $275,000 for 2014. (DN 104-1). Handmaker claims that their base salary was reduced by $50,000 for 2014 because Certus's president, Angela Webb, "wanted to shift our compensation towards more variable versus fixed . . . with the understanding that we would be able to make up that $50,000 readily through variable comp, plus even more, provided that we performed." (DN 104-2, p. 6). In addition, the draft agreements made Handmaker and Vredeveld "eligible to participate in an annual incentive program" and created "Performance Goals" which would determine the amount of Handmaker and Vredeveld's bonuses. (DN 104-1).

Under the draft agreements, in the first year, Handmaker and Vredeveld could earn a bonus of up to 75% of their base salary. (DN 104-2, p. 5). The "Performance Goals" contained in the draft agreements set forth three main "goals" upon which Handmaker and Vredeveld's bonuses would be based. (DN 104-1). These included the "Business Performance Goal," which focused on the annual pre-tax operating profit generated,  the "Individual Performance Goals,"

which would evaluate the retention of key executives, and a consideration of various "Certus Guiding Principles," including excellence, accountability, integrity, leadership, teamwork, enhancing the customer experience, and support of the brand. *Id.*

The final Employment Agreement Handmaker and Vredeveld each eventually signed (collectively, the "Employment Agreements") contained the same base salaries, including the $50,000 reduction in base salary in 2014, but a significantly different bonus clause than the one contained in the draft agreements. (DN 1-2, 1-3). Specifically, the Employment Agreements ultimately signed by the parties made no reference to any "Performance Goals" that would be used to calculate bonuses. (DN 1-2, 1-3). Handmaker stated in his deposition that this omission from the final Employment Agreements was because, during negotiations, "[t]here were so many variables that were integral and so important to how our bonus would be paid," many of which Handmaker and Vredeveld did not fully understand or lacked sufficient information to evaluate, and therefore they "did not feel comfortable at that time committing to a formula with so many items unresolved." (DN 109-1, p. 65).

Accordingly, the "Annual Incentive Program" clause in the Employment Agreements stated only

> you will be eligible to participate in Certus' annual incentive program on terms and conditions that are mutually agreeable to you and the Certus senior executive team. The parties to this letter agreement agree to use reasonable best efforts to establish the performance criteria for the first performance period . . . as soon as reasonably practicable following the date hereof, and in any event prior to the Effective Date. The actual annual incentive payment, if any, will be paid to you no later than the 30th day following the end of the applicable performance period, subject to your continued employment through the last day of the applicable performance period.

(DN 124-3, p. 2; DN 124-4, p. 2). The parties signed the Employment Agreements on October 31, 2012. (DN 1-2). They did not, however, negotiate any performance criteria for Handmaker

and Vredeveld's bonus for the 2013 performance period prior to the Effective Date, as was required by the Annual Incentive Program clause. (DN 109-1, p. 63). Instead, Handmaker and Vredeveld simply worked through 2013. Walter Davis, the former Chief Executive Officer of Certus, and Angela Webb, the former President of Certus, stated in their declarations that following the execution of the Employment Agreements, although neither of them "attempted to establish a bonus formula for the purposes of calculating the amount that Plaintiffs would receive in bonuses," they did have "verbal conversations with Plaintiffs regarding the terms and conditions on which they would be eligible to receive bonuses." (DN 126-1, pp. 3–4; DN 126-2, pp. 3–4). Davis and Webb further stated that, in these conversations, they "represented to Plaintiffs that, in addition to their annual base salary, they would each be eligible to receive a non-discretionary, annual bonus based primarily on the amount of net income generated by their individual business unit during a given calendar year, including both" 2013 and 2014. (DN 126-1, p. 4; DN 126-2, p. 4).

Handmaker further claims that, during 2013, Certus' management "continued to commend us for our strong performance, our leadership, the results, and all the things we were doing for the bank. We trusted them. And they continued to assure us that they would take care of us if we continued to perform." (DN 109-1, p. 43). On January 10, 2014, Handmaker asked Webb, via email: "while we are on the topic of an incentive plan (or lack thereof) for me and George, I am curious how our 2013 incentive comp will be handled due to the absence of an agreed upon plan?" (DN 104-4). Handmaker and Webb subsequently had a phone call in which Webb confirmed that Handmaker and Vredeveld would receive a bonus, but Handmaker does not recall Webb stating an amount or explaining how the bonus would be calculated. (DN 109-1, p. 40). On January 17, Webb requested "final year performance metrics" from Handmaker. (DN

104-4). Davis and Webb, who were in charge of determining Plaintiffs' 2013 bonus payments, stated in their declarations that they "ultimately relied on the same general factors and considerations which the parties had discussed" in the draft agreements. (DN 126-1, p. 4; DN 126-2, p. 4). These included, according to Davis and Webb, an evaluation of each of the three "Performance Goals" contained in the initial drafts. *Id.* Handmaker and Vredeveld were subsequently told they had each been awarded a bonus of $145,000 for 2013, a figure which was confirmed by letter dated February 18, 2014. (DN 109-7).

After Handmaker and Vredeveld received their 2013 bonuses, the issue of bonuses went largely undiscussed for many months. Handmaker does not recall any specific discussions, but claims he and Vredeveld received "continuous accolades from Walter and Angela about our performance and how well we were doing and the leadership that we were showing within the bank, and assuring us that they would take care of us if we continued to perform strongly." (DN 109-1, p. 46). Both Handmaker and Vredeveld claim that it was repeatedly made clear to them that the bonuses they would receive were fundamentally tied to the performance of their business unit. (DN 109-1, pp. 44, 73–74; DN 108-1, p. 12).

In April 2014, Certus' Executive Leadership team (ELT), which included Davis and Webb, were terminated. (DN 109-1, p. 50). John Poelker, Certus' new Interim Chairman, President, and CEO, took over around the end of that month. *Id.* On July 18, 2014, the topic of bonuses was revisited when Colletta Bryce, the Chief Human Resources Officer for Certus, sent Handmaker an email. Bryce inquired whether Handmaker and Vredeveld's $145,000 bonus for 2013 was "a guaranteed payment or a formulaic one based on performance." (DN 104-7, p. 5). In response, Handmaker explained the formula found in the draft employment agreements,

including the 75% maximum and the $50,000 salary deduction Plaintiffs took in 2014, though he admitted it "never materialized into a set formula." *Id.* at 3–4.

Over the next several months, Handmaker had sporadic conversations with Bryce and Poelker. (DN 16-4; DN 104-7). On September 15, 2014, Bryce sent an email to Ralph Strayhorn, one of Poelker's consultants, explaining that she was attaching the "SBF incentive template," which she "thought may help us determine the incentive opportunity for John and George." (DN 104-9). In that same email, Bryce further concluded with "[w]ill get you the comp plan as soon as I get it from John." *Id.* The SBF incentive template is a spreadsheet which purports to take into consideration various "Goals," which included "Pre tax income (division)," which was given a weight of 30%, "GGL Lending and Serv.," given a weight of 20%, "Corporate income," given a weight of 20%, "Talent Retention," given a weight of 15%, and "Management Rating," given a weight of 15%. The template appears to show that the "Actual" figures in the first two categories exceeded the "Target" figure for each. Overall, the template estimated that Plaintiffs had earned a bonus of $269,017.33 each. It appears Bryce never received a response to this email, however.

In October 2014, Handmaker sent Poelker a detailed email explaining the negotiation of the Employment Agreements, the formula contained in the draft employment agreements, and expressing his expectation that Handmaker and Vredeveld would receive a bonus "commensurate with our performance." (DN 109-10). In December 2014, Bryce clarified to Handmaker that "your payment is driven by business results rather than 'pay to stay.'" (DN 104-7, p. 1). Bryce also informed Handmaker and Vredeveld that their bonus "should be made in the February timeline," although the "amount has not yet been determined," but "John [Poekler] is likely to connect with you more on that." *Id.* On December 29, 2014, Poelker sent an email to Handmaker stating "I am willing to pay you for your unused PTO but I want to do it in

conjunction with determining what other payments are due you and the other SBF folks. This includes the 2014 incentives, final purchase payments, and PTO for all SBF employees." (DN 104-13).  Poelker further stated "[h]opefully we will have that done by next week sometime." *Id.*

Handmaker and Vredeveld were terminated on January 21, 2015. The termination notice did not state a reason. It did say that Handmaker and Vredeveld "will not be paid any bonus for 2014 since the bank lost money during the year and no officers are receiving any bonus." (DN 1-4). Handmaker and Vredeveld now claim it was a breach of the Employment Agreements for Certus to fail to pay them a bonus for their performance throughout 2014, to which Plaintiffs claim they were entitled. In 2014, Certus was placed in "troubled condition" by the Office of the Comptroller of the Currency. (DN 102). Certus surrendered its national banking charter in November, 2015 and transferred its residual assets and liabilities to CBSUB, Inc. *Id.*

Now before the Court is Certus' motion for summary judgment on Plaintiffs' breach of contract claim and Plaintiffs' motion for leave to file a second amended complaint to include an alternative claim for quantum meruit.

STANDARD

**I.      Amended Complaint**

Federal Rule of Civil Procedure 15 entitles any party to "amend its pleading once as a matter of course" before being served with a responsive pleading, Fed. R. Civ. P. 15(a)(1), and in all other cases, allows a party to amend either "with the opposing party's written consent or the court's leave." *Id.* at (a)(2). The Rule further states that "court[s] should freely give leave when justice so requires." *Id.* In determining whether the interests of justice support a grant of leave to amend, courts consider several factors, including "undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous

amendments, undue prejudice to the opposing party, or futility of the amendment." *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005) (citing *Coe v. Bell*, 161 F.3d 320, 341–42 (6th Cir. 1998)); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). "The grant or denial of leave to amend is within the discretion of the trial court, and review is for abuse of discretion." *Sec. Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1001, 1008 (6th Cir. 1995) (citing *Roth Steel Prods. v. Sharon Steel Corp.,* 705 F.2d 134, 155 (6th Cir.1983)).

## II.    Summary Judgment

Summary judgment is proper if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence.  To support this position, he must present evidence on which the trier of fact could find for the plaintiff.  *See id*. (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render

summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### I.     Plaintiffs' Motion for Leave to File a Second Amended Complaint.

The Court will first address Plaintiffs' Motion for Leave to File a Second Amended Complaint (DN 124). For the following reasons, Plaintiffs' motion is denied.

Plaintiffs seek leave from this Court to file a second amended complaint "for the sole purpose of allowing them to assert a quantum meruit claim as an alternative to their existing breach of contract claim." (DN 124-1, p. 2). Plaintiffs argue an amendment is warranted in light of certain "newly asserted arguments" made by Certus in its motion for summary judgment "challenging the contractual validity of the bonus provisions themselves as well as the contractual validity of the subsequent oral agreements reached between the parties." *Id.* at 3. Accordingly, Plaintiffs seek to assert a quantum meruit claim in alternative to its breach of contract claim "in the unlikely event the Court concludes that the bonus provisions and/or the subsequent oral agreements reached between the parties are unenforceable." *Id.*

As an initial matter, the Court fails to see how "justice so requires" Plaintiffs' proposed amendment in this case. *See* Fed. R. Civ. P. 15(a)(2).  In its response, Defendant claims that it did not "assert any "newly-raised arguments" in its Summary Judgment Motion. Rather, Defendant maintained, as it has from the moment Plaintiffs first claimed that they were owed a bonus payment for 2014, that Plaintiffs are not *contractually* entitled to a 2014 bonus." (DN 127, p. 7). Defendant references, for example, its August 13, 2015 Response in Opposition to Plaintiffs' Motion for Reconsideration (DN 74), in which Defendant stated

> Bonus payments were discretionary, as indicated by the Key Employment Letters attached to Plaintiffs' own Complaint. Doc. No. 1-2, 1-3, page 2 (stating the date

9

> that "incentive payment, *if any*," will be paid) (emphasis added). No documents
> Plaintiffs have submitted indicate that payments were guaranteed and
> nondiscretionary. Therefore, because there were no terms for payment of
> guaranteed bonuses, nothing could be accrued and thus nothing was owed.

(DN 74, p. 5). In that same document, Defendant further stated that Plaintiffs were not contractually eligible for a bonus for 2014 because "they were not actually still employed by Certus on the 'last day of the applicable performance period' as set forth in the Employee Letters." (DN 127, p. 7 (quoting DN 74, p. 6)). Therefore, Defendant claims, the arguments made in its motion for summary judgment, far from "newly-asserted," are the same arguments Defendant has asserted throughout the litigation.

In their reply, Plaintiffs maintain that there is a "distinction between [Certus'] original argument that Plaintiffs were not contractually entitled to a bonus because the bonus provisions in the Employment Agreements purportedly only provided for a discretionary bonus, and its recent argument that the bonus provisions themselves and/or the verbal agreement between the parties are too indefinite to be enforced." (DN 130, p. 4). The Court remains unconvinced that such a distinction exists. Rather, the Court agrees, as Defendant stated in its response, that Defendant does not purport to challenge the enforceability of the bonus provisions in the Employment Agreements, but merely contends that, under those provisions, "there were no terms for payment of *guaranteed* bonuses." (DN 74, p. 5). Moreover, Defendant's argument set forth in its motion for summary judgment that no subsequent oral agreement between the parties occurred or was valid does not appear to be a "new" argument, but merely part and parcel of its original argument that Plaintiffs were never contractually guaranteed a bonus for 2014.

Moreover, Defendant argues that allowing Plaintiffs to file a second amended complaint at this late stage of the litigation is not appropriate when taking into consideration certain other factors, including that Plaintiff's proposed amendment is unduly delayed, would cause

10

significant prejudice to Certus, and would be futile.  (DN 127). Defendant contends that, because the arguments set forth in its summary judgment motion are not new but rather have been asserted from the outset of the litigation, "Plaintiffs were aware of any alleged basis for any potential quantum meruit claim at the time of their initial complaint well over a year ago," making their delay in seeking amendment until after Defendant's summary judgment motion "undue." *Id.* at 9. As justification for their delay, Plaintiffs maintain that they "had no reason to know they would need to assert a separate quantum meruit claim until Certus filed its Motion for Summary Judgment arguing that the bonus provisions themselves should be held contractually unenforceable." (DN 130, p. 3). As discussed above, however, the Court agrees that Defendant made no such "new" arguments in its summary judgment motion regarding the enforceability of the bonus provisions, but rather maintained, as it has from the outset, that neither the Employment Agreement nor any subsequent agreement contractually guaranteed Plaintiffs a bonus for 2014.

While it is true, as the Sixth Circuit has explained, that "[d]elay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself to disallow an amendment of a pleading, *Moore v. City of Paducah*, 790 F.2d 557, 561 (6th Cir. 1986), mere delay is not the sole factor weighing against granting Plaintiffs leave to amend in this case. Specifically, the Court agrees that adding a new claim at this late stage in the litigation likely *would* cause prejudice to Defendant. To refute this point, Plaintiffs argue that because "the proposed quantum meruit claim is based on the same facts as the existing breach of contract claim, Certus would need to conduct little if any additional discovery in order to adequately prepare its defense." (DN 130, pp. 1–2). Certus disagrees, however, and argues that allowing an amendment at this stage, specifically, "after discovery has closed and the Defendant has filed a

motion for summary judgment . . . *would* require re-opening fact (and probably expert) discovery, re-briefing of dispositive motions, and necessarily continuing the existing trial date." (DN 127, pp. 9–10). The Court agrees.

And although Plaintiffs may be correct that a quantum meruit claim arises from the same basic facts as their original breach of contract claim, the Sixth Circuit has explained that even when the proposed amendment arises from the same facts as those set forth in the original complaint, denial of leave to amend is still appropriate when undue delay and undue prejudice exist. *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828 (6th Cir. 1999) (upholding district court's denial of leave to amend the complaint where plaintiff was aware of the basis for the proposed amendment months before leave was sought, plaintiff did not seek leave until after the discovery and dispositive motion deadlines passed, and after a motion for summary judgment had been filed). In *Duggins*, the court upheld the district court's denial of leave to amend when, although "the district court did not deny that the complaint might allege the underlying facts of [the proposed new] claim . . . the court cited undue delay and undue prejudice to the opponent as the reasons for its denial of leave to amend." *Duggins*, 195 F.3d at 834. Similarly, in *Nagler*, the court again upheld the district court's denial of leave to amend on the grounds that prejudice to the defendant was highly likely if a new claim were to be added "after the close of discovery and after a motion for summary judgment ha[d] been filed." *Nagler v. Garcia*, 370 F. App'x 678, 682 (6th Cir. 2010).

Because the Court finds that allowing the requested amendment at this late stage in the litigation is not necessitated based on any "newly-asserted arguments," thereby making the current motion both unduly delayed and likely to cause prejudice to Certus, Plaintiffs' motion for leave to file a second amended complaint is denied.

## II.      Defendant's Motion for Summary Judgment.

Also before the Court is Defendant Certus' motion for summary judgment on Plaintiffs' breach of contract claim (DN 118). Because the Court finds that genuine issues of material fact exist in this case, summary judgment is inappropriate, and Certus' motion is accordingly denied.

The sole remaining claim asserted by Plaintiffs against Certus is a claim for breach of contract. Specifically, in their First Amended Complaint, Plaintiffs allege the Employment Agreements were breached when "Certus failed to design and deliver any incentive pay program to Plaintiffs and failed to pay any bonus to Plaintiffs for the year 2014." (DN 23-2, p. 5). Plaintiffs further state that, "[a]s agreed upon by Certus and Plaintiffs, said bonus was to be paid based on the performance of Plaintiffs' business unit," and that

> Certus failed to pay said agreed-upon bonus for the year 2014 despite the fact that: (a) all other officers received a bonus for the year 2014; (b) Plaintiffs' performance far exceeded their budgeted goal for the year 2014; and (c) Plaintiffs' performance far exceeded their performance for the year 2013, a year in which Plaintiffs were paid a bonus . . . .

*Id.*

> The provision in the Employment Agreements regarding bonuses provides:

> **Annual Incentive Program**: For each year you are employed by Certus during the Term you will be eligible to participate in Certus' annual incentive program on terms and conditions that are mutually agreeable to you and the Certus senior executive team. The parties to this letter agreement agree to use reasonable best efforts to establish the performance criteria for the first performance period . . . as soon as reasonably practicable following the date hereof, and in any event prior to the Effective Date. The actual annual incentive payment, if any, will be paid to you no later than the 30th day following the end of the applicable performance period, subject to your continued employment through the last day of the applicable performance period.

(DN 124-3, p. 2; DN 124-4, p. 2). It appears that the parties do not dispute that the Annual Incentive Program clause itself does not contain explicit language 1) guaranteeing a bonus to

Plaintiffs or 2) setting forth a specific method for calculating Plaintiffs' potential bonuses. (DN 118-1, pp. 11–12). Indeed, Plaintiffs acknowledge in their response that, because

> the parties were unable to reach a final agreement regarding bonuses prior to the execution of the Employment Agreements . . . rather than finalizing any agreement with regard to bonuses, the parties decided that they would instead continue to negotiate in good faith in order to reach an agreement in the future regarding the specific terms and conditions on which Plaintiffs would be entitled to receive bonuses.

(DN 126, p. 5).

While the parties agree that the Employment Agreements did not contain a contractual guarantee to bonuses, the parties strongly dispute whether any *subsequent* agreement or modification took place between the parties through verbal agreements and conduct. Specifically, Plaintiffs claim the existence of a "verbal agreement reached between the parties subsequent to the execution of the Employment Agreements." *Id.* at 17. Defendant, on the other hand, "**absolutely disputes** that Plaintiffs had any enforceable verbal contract for a guaranteed bonus for 2014." (DN 128, p. 5).

It is unclear whether Plaintiffs claim that any alleged subsequent verbal agreement was a modification of the Employment Agreements or an entirely new oral contract between the parties, but because "[a] modification of a written contract must fulfill all of the elements required for a valid contract," the analysis is the same regardless. *Roberts v. Gaskins*, 486 S.E.2d 771, 773 (S.C. Ct. App. 1997) (citing *Player v. Chandler*, 382 S.E.2d 891 (S.C. 1989)). "The necessary elements of a contract are an offer, acceptance, and valuable consideration." *Sauner v. Pub. Serv. Auth. of S. Carolina*, 581 S.E.2d 161, 166 (S.C. 2003). Additionally, "South Carolina common law requires that, in order to have a valid and enforceable contract, there must be a meeting of the minds between the parties with regard to *all* essential and material terms of the agreement." *Player*, 382 S.E.2d at 893 (citing *Hughes v. Edwards*, 220 S.E.2d 231 (S.C. 1975)).

14

"The 'meeting of minds' required to make a contract is not based on secret purpose or intention on the part of one of the parties, stored away in his mind and not brought to the attention of the other party, but must be based on purpose and intention which has been made known or which, from all the circumstances, should be known." *Id.* at 894. "The burden of establishing the existence of an oral contract and its terms" is on the party alleging such a contract was formed. *LandBank Fund VII, LLC v. Dickerson*, 632 S.E.2d 882, 886 (S.C. Ct. App. 2006). "In order to establish the existence of an oral . . . agreement, [a party] must prove by a preponderance of the evidence that there was a meeting of the minds as to all of the essential and material terms of the alleged agreement." *Id.* at 887 (citing *Player*, 382 S.E.2d at 893–94).

"Whether there was a meeting of the minds between [the parties] . . . [i]s a question of fact for the jury to decide." *Hobgood v. Pennington*, 387 S.E.2d 690, 693 (S.C. Ct. App. 1989). However, "where the undisputed facts do not establish a contract, the question becomes one of law." *Stevens & Wilkinson of S. Carolina, Inc. v. City of Columbia*, 762 S.E.2d 696, 701 (S.C. 2014) (citing *Capital City Garage & Tire Co. v. Elec. Storage Battery Co.*, 101 S.E. 838, 841 (S.C. 1920)). Because the Court finds that both parties have presented evidence regarding the existence, or lack thereof, of a meeting of the minds between the parties regarding a subsequent agreement as to bonuses sufficient to raise a genuine issue of material fact, summary judgment in Certus' favor is inappropriate.

In support of Plaintiffs' argument that a subsequent agreement was formed, Plaintiffs contend that "the negotiations between the parties prior to the execution of the Employment Agreements," a "subsequent verbal agreement," and the parties' "corresponding conduct" should all be considered. (DN 126, p. 16). Certus, in turn, makes several arguments as to why a consideration of these factors is either improper or, even when considered, does not establish the

existence of a contract as a matter of law, and therefore that warrant summary judgment in its favor. The Court will address each of these arguments in turn.

### A. Integration Clause and Parol Evidence.

In support of Plaintiffs' argument that a subsequent verbal agreement was made, Plaintiffs claim that both correspondence subsequent to the execution of the Employment Agreements between Plaintiffs and Webb, "along with the draft agreements referenced by Ms. Webb reflect all the factors and considerations that would be taken into account in determining the amount of the bonuses, [and therefore] they alone provide more than sufficient written evidence of the verbal agreement between the parties." *Id.* at 24.  Defendant argues, however, that a consideration of the draft agreements, which were part of the negotiations between the parties and not included in the final Employment Agreements, would be barred both by the "Entire Agreement" clause and by the parol evidence rule.

The Employment Agreements contain the following clause:

> **Entire Agreement; Amendment**: This letter agreement and any exhibits hereto contain the entire understanding of you and Certus with respect to the subject matter hereof and will cancel and supersede any and all other agreements or arrangements, whether written or oral, between you and Certus or any of its subsidiaries or affiliates with respect to the subject matter hereof . . . Any amendment or modification of this letter agreement will not be binding unless in writing and signed by you and Certus.

(DN 124-3, pp. 4–5; DN 124-4, pp. 4–5). Defendant argues that the effect of this clause is to bar a consideration of any and all "prior discussions relating to the incentive payment section of the agreement." (DN 118-1, pp. 12–13).  Additionally, Defendant argues that a consideration of such prior discussions is barred by the parol evidence rule, *id.* at 13, which "prevents the introduction of extrinsic evidence of agreements or understandings contemporaneous with or prior to execution of a written instrument when the extrinsic evidence is to be used to contradict, vary or

explain the written instrument." *In re Estate of Holden*, 539 S.E.2d 703, 708 (S.C. 2000) (quoting *Gilliland v. Elmwood Props.*, 391 S.E.2d 577, 581 (S.C. 1990)). Defendant further argues that parol evidence is even more definitively prohibited in situations such as this one where the parties have included an clause which states that the contract "contain[s] the entire understanding" of the parties. (DN 118-1, pp. 13–14).

The Court finds Defendant's arguments unpersuasive. Although "[t]he terms of a completely integrated agreement cannot be varied or contradicted by parol evidence of prior or contemporaneous agreements not included in the writing, *Wilson v. Landstrom*, 315 S.E.2d 130, 134 (S.C. Ct. App. 1984),

> [a] well recognized exception to the parol evidence rule is that parol evidence may be admitted to show a separate and independent agreement which is not inconsistent with the terms of a contemporaneous agreement if it can be inferred the parties did not intend the written paper to be a complete integration of the agreement.

*Beckham v. Short*, 365 S.E.2d 42, 43 (S.C. Ct. App. 1988), *aff'd*, 380 S.E.2d 826 (S.C. 1989). Here, although the Employment Agreements contain a clause stating they represent the "entire understanding" of the parties, they also contain the somewhat conflicting Annual Incentive Program clause, which states that the parties "agree to use reasonable best efforts to establish performance criteria for the first performance period . . . ." (DN 124-3, p. 2; DN 124-4, p. 2). That the parties included in the Employment Agreements an agreement to continue to negotiate performance criteria for Plaintiffs' future bonus determinations suggests that the Employment Agreements left open certain terms and therefore did not actually represent the entire understanding of the parties.

Moreover, the criteria contained in the draft agreements would not constitute impermissible "parol evidence" if, as Plaintiffs claim, it ultimately became part of a *separate*,

new agreement. To the extent Plaintiffs allege that the same criteria for calculating bonuses that was contained in the draft agreements ultimately became part of a separate, *subsequent* bonus agreement between the parties, evidence of those criteria would not "contradict, vary, or explain" any terms of the Employment Agreements, but instead would identify the terms of the alleged subsequent verbal agreement Plaintiffs claim occurred. Specifically, Plaintiffs argue that Webb, by discussing bonuses with them subsequent to the execution of the Employment Agreements, "effectively incorporated the [factors from the draft agreements] by reference" into a *new* verbal agreement. (DN 126, p. 24). Therefore, if a jury finds that such a separate agreement exists, the draft agreements are not parol evidence, but evidence of the terms of the new, subsequent agreement.

### B.  Lack of Sufficient Definiteness.

Defendant next argues that, "[b]ecause the Agreements do not guarantee payment of a bonus or set forth the amount or method for determining any such bonus amount, they do not constitute binding contracts for bonus payments" because there is no sufficiently definite "price or method for calculating the bonus." (DN 118-1, p. 15). Plaintiffs do not dispute, however, that the written Employment Agreements contained no such terms. Rather, Plaintiffs contend that, although the parties did not "expressly agree upon the exact method" for calculating bonuses in the Employment Agreements themselves, that the "course of performance and corresponding conduct reflected a clear meeting of the minds that the bonuses would be based on the same factors and considerations that would have been taken into account under the various "Performance Goals" contained in the draft employment agreements." (DN 126, pp. 29–30).

Defendant further argues, however, that any alleged verbal agreement, too, would fail for lack of definiteness and a lack of mutual assent to material terms of a contract. In support of this

argument, Defendant points out that Plaintiffs "admit that: (1) Defendant failed to design a 2014 bonus payment (Doc. No. 23-2); and (2) Plaintiffs are 'unsure exactly how Mr. Davis and Ms. Webb had calculated the 2013 bonus.'" (DN 128, p. 8 (quoting DN 126, p. 11)). It is certainly possible that a jury would agree, based on these statements, that no meeting of the minds occurred as to all material terms of a subsequent verbal agreement.

Plaintiffs, on the other hand, have produced evidence that would potentially allow a jury to find that a meeting of the minds did occur as to material terms. For instance, in their declarations, Davis and Webb stated that, in calculating the 2013 bonuses, they both represented to Plaintiffs in verbal discussions that they would rely "primarily on the amount of net income generated by their individual business unit" and further stated that they did, in fact, "ultimately rel[y] on the same general factors and considerations which the parties had discussed" in the draft agreements. (DN 126-1, p. 4; DN 126-2, p. 4). These included, according to Davis and Webb, an evaluation of each of the three "Performance Goals" contained in the initial drafts. *Id.* When Handmaker and Vredeveld were subsequently awarded a bonus of $145,000, they accepted it without question. (DN 126, pp. 31–32).

Moreover, Plaintiffs state that, when Webb asked them for "the final year performance metrics," including "revenue" and "% of BDO retained" when calculating their 2013 bonuses, she indicated that she was requesting those "per agreement." *Id.* at 24. In addition, the "SBF Incentive Template" put together by Bryce, which appears to take into consideration similar factors as those in the draft agreements, including the pre-tax income for Plaintiffs' division, talent retention, and management rating, (DN 104-10), could also support a finding that those factors were agreed upon by the parties. While, as Defendant points out and as this Court previously noted, the fact that "Handmaker and Vredeveld were unaware this spreadsheet existed

19

. . . reinforces the inference that they had limited input into calculating their bonuses," (DN 110, p. 12), the Court agrees with Plaintiffs that the template could also constitute "conduct [that] reflects Certus' own interpretation of the agreements between Plaintiffs and the former ELT." (DN 126, pp. 33–34).

Because both parties have produced evidence that could allow a jury to make a determination in their favor on the issue of whether a meeting of the minds occurred as to all essential terms of a subsequent agreement, there is a genuine issue of material fact on this point, and summary judgment is therefore inappropriate.

### C. Subsequent Oral Agreement.

Defendant next argues that no valid subsequent oral modification or agreement would be valid or enforceable, and therefore that Defendant is entitled to judgment as a matter of law. Defendant makes two points in support of this argument: first, that the Employment Agreements prohibited oral modification, and second, that any oral modification would be invalid for failure to comply with the Statute of Frauds. (DN 118-1, p. 16).

The "Entire Agreement; Amendment" clause of the Employment Agreements states that "[a]ny amendment or modification of this letter agreement will not be binding unless in writing and signed by [Plaintiffs] and Certus." (DN 124-3, pp. 4–5; DN 124-4, pp. 4–5). Based on this language, Defendant contends that, as "such [a] signed agreement does not exist . . . any showing of a lawful modification" is impossible. (DN 118-1, p. 17). In response, Plaintiffs argue, and the Court agrees, that "[w]ritten contracts may be orally modified by the parties, even if the writing itself prohibits oral modification." *ESA Servs., LLC v. S. Carolina Dep't of Revenue*, 707 S.E.2d 431, 438 (S.C. Ct. App. 2011) (citing *S.C. Nat'l Bank v. Silks*, 367 S.E.2d 421, 422 (S.C. Ct. App. 1988)). Therefore, under South Carolina law, it is nonetheless possible for the parties to

make a subsequent oral modification of the Employment Agreements even though the Employment Agreements provide otherwise. Although it is true that, to be valid and enforceable, any such oral modification requires "a meeting of the minds between the parties with regard to all essential terms of the agreement," *id.* at 438, as discussed above, this is a factual issue for the jury.

Defendant next argues that an oral modification or agreement with respect to bonuses would be invalid and unenforceable under the Statute of Frauds "[b]ecause Plaintiffs allege payment of bonuses was owed in 2015 (for performance in 2014) under the Agreements which were executed in 2012, there can be no argument that the alleged bonus amount was not owed more than a year after the execution of the Agreements." (DN 118-1, p. 17). In response, Plaintiffs contend that, "because the verbal agreement would have been subject to the overall at-will nature of the Employment Agreements, it was not subject to the statute of frauds and is therefore enforceable notwithstanding the absence of a signed writing." (DN 126, p. 23). However, if, as Plaintiffs contend, a subsequent oral agreement occurred that guaranteed a bonus to be paid at a time greater than a year after that oral agreement, the Court agrees the Statute of Frauds may apply. Under South Carolina law, "[a]n oral agreement, including an oral modification, will be barred by the Statute of Frauds if it is incapable of being performed within one year." *Gaskins*, 486 S.E.2d at 774 (citing *Player*, 382 S.E.2d at 894)). If, on the other hand, "there is a possibility of performance within a year, the contract is not barred by the Statute of Frauds." *Id.*

It is unclear, however, exactly *when* Plaintiffs allege a subsequent verbal agreement or modification took place in this case. For instance, Plaintiffs state that, "in emails they exchanged in January 2014, Mr. Handmaker and Ms. Webb discussed all the relevant factors and

considerations that would be taken into account in determining the amount Plaintiffs would receive as bonuses." (DN 126, p. 24). Plaintiffs further state a subsequent agreement is evidenced by the conduct of the parties, specifically, that "Webb did in fact base the amount of the 2013 Bonuses on the same factors and considerations that would have been taken into account under the various "Performance Goals" contained in the draft employment agreements," which culminated in the payment of a $145,000 bonus for 2013, of which Plaintiffs were notified on February 18, 2014, and paid on February 28, 2014. *Id.* at 31–32. If, therefore, the subsequent agreement claimed by Plaintiffs was formed in January or February 2014, and under the terms of that agreement, Plaintiffs were guaranteed a 2014 bonus in January or February of the following year, then the oral agreement would not be barred by the Statute of Frauds because it *could* be fully performed within one year. If, on the other hand, there either was no subsequent agreement, or such an agreement was formed prior to January 2014, then the agreement for the 2014 bonuses would not have been capable of performance within one year.

Accordingly, the Court finds a genuine issue of material fact as to *when* a subsequent agreement, if any, was formed between the parties. Therefore, this issue is inappropriate for disposition on summary judgment grounds at this time. If, however, a jury concludes such an agreement was reached more than one year before Plaintiffs were due their 2014 bonuses under that agreement, the court will entertain further argument from the parties regarding the applicability of the Statute of Frauds, and whether its requirements were satisfied by an adequate writing, at that time.

### D.  Employed on the Last Day of the Applicable Performance Period.

Finally, Defendant argues that, regardless of whether Plaintiffs were contractually guaranteed a bonus for 2014, Plaintiffs were nonetheless ineligible to receive any bonus because

22

they were not employed "through the last day of the applicable performance period" as required by the "Annual Incentive Program" clause of the Employment Agreements. (DN 118-1, p. 23). The Employment Agreements state, first, that the "first performance period" "begins on the Effective Date and ends on the first anniversary of the Effective Date." (DN 124-3, p. 2; DN 124-4, p. 2). They further provide that "the Effective Date" will occur at the time of Closing, which is defined in the "Purchase Agreement." (DN 124-3, p. 1; DN 124-4, p. 1). As defined in the Stock Purchase Agreement, the "Closing" occurred at "the consummation of the transactions contemplated by this Agreement." (DN 20, p. 3 (filed under seal)). The "Closing date," is defined as "the date on which the Closing occurs." *Id.*

Based on these definitions, Defendant argues that "[t]he Closing occurred on January 31, 2013," thereby making "the last day of the second performance period . . . January 31, 2015." (DN 118-1, pp. 23–24). Because Plaintiffs were terminated on January 21, 2015, and were not, in effect, employed on January 31, 2015, Defendant argues Plaintiffs could not possibility have been entitled to a bonus as a matter of law.  *Id.* Plaintiffs disagree with this argument on several grounds. First, Plaintiffs argue that a genuine issue of material fact exists as to when "the last day of the applicable performance period" actually was. (DN 126, p. 42). Plaintiffs contend, because the term "applicable performance period" itself is never defined in the Employment Agreements, but rather only "the first performance period" is defined, that the "second performance period" could, in fact, have been different than the first. *Id.* at 42–43.

Specifically, Plaintiffs claim that this term was left to be agreed upon at a later date, and that the subsequent conduct of the parties reflects an agreement that the "second performance period" would instead "be coextensive with the calendar year, as opposed to the incongruous period of February 1st through January 1st as alleged by Certus." *Id.* at. 43. In support of this

argument, Plaintiffs point out that, when Webb first emailed Handmaker to request "the "final year performance metrics" for the purposes of determining the amount of their 2013 Bonuses, it was clear that she was requesting the 'performance metrics' solely for the 2013 calendar year." *Id.* Additionally, Plaintiffs claim that the facts that 1) Webb sent this email on January 17, 2014, 2) indicated she needed a response by January 23, 2014, and 3) Handmaker's response specifically contained only the metrics only for "the 11 month year" from February 1, 2013 to December 31, 2013 show that "Mr. Davis and Ms. Webb ultimately determined the amount of the 2013 Bonuses based on their performance during the 2013 calendar year alone," as opposed to a year ending on January 31, 2014. In addition, "Certus' fiscal year for accounting purposes was likewise coextensive with the calendar year." *Id.* at 44. Therefore, Plaintiffs argue "that there is at the very least a question of fact whether the second performance period would have ended on December 31, 2014, as opposed to January 31, 2015," in which case Plaintiffs would still have been employed on the last day of the applicable performance period. *Id.*

Second, Plaintiffs argue that even if the second performance period was the same as the first, there are nonetheless questions of fact as to when the Closing, defined as the "the consummation of the transactions contemplated by this Agreement," actually occurred. Because the Effective Date and the "first anniversary of the Effective Date" are both defined in relation to the Closing, this, too, could affect when the last day of the second performance period occurred. Specifically, Plaintiffs dispute Defendant's conclusion that the "Closing" occurred on January 31, 2013. *Id.* at 45. The date on the Stock Purchase Agreement Closing Documents is January 31, 2013. (DN 120, p. 1 (filed under seal)). However, Plaintiffs point to a footnote placed next to the date "January 31, 2013" on the "Closing Certificate" form of the Stock Purchase Agreement Closing Documents, which states: "[t]o the extent permitted by the applicable regulations and

24

notwithstanding the actual date of the Closing, the Closing shall be deemed to have taken place on December 31, 2012." *Id.* at 11 fn 1.

Rather than presenting a question of fact for the jury, this issue presents a question of law. "The *construction* of a clear and unambiguous contract is a question of law for the court to determine." *Williams v. Gov't Emps. Ins. Co. (GEICO)*, 762 S.E.2d 705, 710 (S.C. 2014) (citing *Hawkins v. Greenwood Dev. Corp.,* 493 S.E.2d 875, 878 (S.C. Ct. App. 1997)). "A court must enforce an unambiguous contract according to its terms regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully." *Lee v. Univ. of S. Carolina*, 757 S.E.2d 394, 397 (S.C. 2014), *reh'g denied* (May 7, 2014) (citing *S. Carolina Dep't of Transp. v. M & T Enters. of Mt. Pleasant, LLC*, 667 S.E.2d 7, 13 (S.C. Ct. App. 2008)). "It is also a question of law whether the language of a contract is ambiguous." *S. Carolina Dep't of Transp.*, 667 S.E.2d at 13. "A contract is ambiguous when the terms of the contract are inconsistent on their face, or are reasonably susceptible of more than one interpretation." *Hawkins*, 493 S.E.2d at 878.

Here, the language used by the parties in the Closing Documents contained in the Purchase Agreement is unambiguous. Although the date on the top of the documents is January 31, 2012, the parties nonetheless included a footnote on the Closing Certificate explicitly stating that "the Closing shall be deemed to have taken place on December 31, 2012." (DN 120, p. 11 fn 1 (filed under seal)). The meaning of this statement is clear: that the parties *intended to treat* the Closing as occurring on December 31, 2012.  The Court will therefore enforce the words chosen by the parties, and as a matter of law, finds that the Closing, and therefore, and any anniversaries of the "Effective Date," occurred on December 31, rather than January 31. Therefore, "because Plaintiffs were still employed until January 21, 2015, over 3 weeks after December 31, 2014,"

(DN 126, p. 44), the Court finds Plaintiffs were employed "through the last day of the applicable performance period" as required by the Annual Incentive Program provision of the Employment Agreements. (DN 124-3, p. 2; DN 124-4, p. 2). The Court need not address Plaintiffs' additional argument as to whether the provision requiring Plaintiffs to be employed "through the last day of the applicable performance period" was only applicable if Plaintiffs *voluntarily quit* prior to that date, (DN 126, p. 46), as the Court has already determined Plaintiffs were employed through the requisite time period.

### E.  Good Faith and Fair Dealing.

Finally, Plaintiffs argue that summary judgment is inappropriate on their breach of contract claim because Defendant breached the "implied covenant of good faith and fair dealing" that "exists in every contract." *Adams v. G.J. Creel & Sons, Inc.*, 465 S.E.2d 84, 85 (S.C. 1995). (DN 126, pp. 47–48). Plaintiffs claim that Defendant breached this duty by:

> 1) failing to make its reasonable best efforts to establish or negotiate with Plaintiffs to establish a bonus formula or other specific performance criteria that would have been sufficiently definite to be enforceable; 2) arbitrarily refusing to pay Plaintiffs bonuses which, even if discretionary, were clearly deserved in light of their extraordinary performance during 2014; and 3) baselessly terminating Plaintiffs only 10 days before what Certus now claims to have been the end of the last day of the applicable performance period for the sole purpose of attempting to justify its arbitrary refusal to pay them their bonuses.

With regard to their first point, Plaintiffs contend that, rather than establishing performance criteria for evaluating bonuses as provided for in the Annual Incentive Program provision, Defendant instead "strategically chose to simply continue assuring Plaintiffs that they would receive a bonus all the while anticipating that it could refuse to honor its agreement if it ultimately found it to be more convenient." (DN 126, p. 50).

As to Plaintiffs' second point, they claim that, even if the payment of bonuses *was* discretionary, as Defendants claim it was, Defendants exercised that discretion arbitrarily and in

bad faith. *Id.* at 50–52. Plaintiffs argue that their strong performance in 2014, including that "Plaintiffs' business unit generated over $19 million in net income, almost 3 times as much as they generated during 2013 when they were paid a $145,000.00 bonus," is evidence that Defendant's decision not to pay Plaintiffs a bonus in 2014 was a breach of the duty of good faith and fair dealing. *Id.* at 51–52.  Plaintiffs claim that the fact that "the bank as a whole lost money during 2014" is not a sufficient justification for Certus failing to pay Plaintiffs a bonus, because "the verbal agreement between the parties as well as their corresponding conduct make clear that Plaintiffs' bonuses were tied exclusively to the performance of their individual business unit, as opposed to the bank as a whole." (DN 126, p. 52). Indeed, Plaintiffs point out that they still received a bonus for 2013 despite the fact that the bank also "sustained significant losses during 2013 which were actually $6 million greater than those ultimately sustained during 2014." *Id.* In its reply, Defendant argues that, because "*no* executives received performance bonuses for 2014 because of the financial condition of the bank," there is insufficient evidence to create an issue of fact as to whether Defendant acted arbitrarily in deciding not to award Plaintiffs a bonus for that year. (DN 128, p. 11).

To refute Plaintiff's third ground for breach of the duty of good faith and fair dealing, that is, that Certus terminated Plaintiffs in bad faith for the sole purpose of denying them their 2014 bonuses, Defendant contends that "there is no breach of an implied covenant of good faith where a party to a contract has done what provisions of the contract expressly gave him the right to do." *Adams*, 465 S.E.2d at 85. (*See* DN 128, p. 9). Because Plaintiffs' employment contracts were at-will, meaning Plaintiffs or Certus could terminate the employment at any time, with or without cause, Defendant argues that it "was well within its rights to terminate Plaintiffs' employment on January 21, 2015." (DN 128, p. 10). Defendant further argues that Plaintiffs have

presented no evidence tending to show "that Defendant's 'true motivation' for terminating Plaintiffs' employment may have been "for the specific purpose of divesting them of their [alleged] right to receive bonuses.'" *Id.* (quoting DN 126, p. 54, 56).

Plaintiffs concede that the termination of an at-will employment contract, alone, is insufficient to constitute breach of the duty of good faith and fair dealing. (DN 126, p. 53). However, Plaintiffs argue that "where the termination was specifically motivated by the employer's desire to deny compensation or other benefits which the employee had already earned or to which they would be entitled in the near future" *does* constitute breach of that duty. *Id.* at 53 (citing *Worley v. Wyoming Bottling Co.*, 1 P.3d 615, 627 (Wyo. 2000) (stating that "in order to establish that the implied covenant has been breached, most commonly the employee must have been terminated to avoid payment of commissions or benefits already earned, or to avoid payment of benefits scheduled to arise or vest in the near future."))

Specifically, Plaintiffs point out that Certus terminated Plaintiffs on January 21, 2015, "only 10 days before what it now alleges to have been the 'last day of the applicable performance period.'" (DN 126, p. 53). Contrary to this fact being "pure speculation" insufficient to create a factual issue for the jury, as Defendant contends, the Court agrees that the timing of Plaintiffs' termination is sufficient to create a genuine issue of material fact for the jury on Plaintiffs' good faith and fair dealing claim. Certus terminated Plaintiffs just ten days before the date on which Certus claims Plaintiffs must have been employed in order to be eligible to receive their bonuses. While a jury could find that Defendant acted properly in exercising its right to terminate Plaintiffs under the at-will employment contract, a jury could also determine that Defendants acted with the intent of rendering Plaintiffs ineligible to receive their bonuses for

2014. Therefore, summary judgment on Plaintiffs' good faith and fair dealing claim is inappropriate.

## CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Leave to File a Second Amended Complaint (DN 124) is DENIED and Defendant CertusBank's Motion for Summary Judgment (DN 118) is DENIED.


cc:     Counsel